INTERNATIONAL PAVEMENT COMPANY, Plaintiff in Error, *v.* SMITH, BEGGS & RANKEN MACHINE COMPANY, Defendant in Error.

### April 7, 1885.

WARRANTY—EXPRESS EXCLUDES IMPLIED.—An express warranty concerning the quality of the article sold excludes any implied warranty that the article is reasonably fit for its intended purpose.

ERROR to the St. Louis Circuit Court, ADAMS, J.

*Affirmed.*

Hiram J. Grover, for the plaintiff in error: Where the contract of sale is executory, and an immediate delivery, or inspection is not contemplated by the parties, there is an implied warranty on the part of the vendor that when delivered the article will be fit and suitable for the purpose for which it is sold.—Parsons' Contracts, 7th ed. vol. 1, sect. 584, notes; *Rodgers* v. *Niles*, 11 Ohio 56; *Chandler* v. *Lopus*, Smith's Leading Cases, vol. 1, pp. 340 and 314. If he sells it for a particular purpose he undertakes that it shall be fit for that particular purpose.—*Jones* v. *Bright*, 5 Bing. 523; *Beals* v. *Olmstead*, 24 Vt. 114; *Kellogg Bridge Co.* v. *Hamilton*, 110 U. S. S. C. 108; Wharton, Contracts, vol. 2, sects. 905, 906; Parsons' Contracts, vol. 1, sect. 586.

Broadhead & Haeussler, for the defendant in error: An express warranty of quality in any particular excludes the idea of an implied warranty.—*Baldwin* v. *VanDiesen*, 37 N. Y. 487; Wharton on Contracts, sect. 220; Benjamin on Sales (1883) sect. 1002; *Denny* v. *Foster*, 42 N. H. 175; *Jackson* v. *Langston*, 61 Ga. 394; *Parkinson* v. *Lee*, 2 East. 314; *McGrew* v. *Fletcher*, 35 Mich. 104; *Mullain* v. *Thomas*, 43 Conn. 252.

Lewis, P. J., delivered the opinion of the court.

The plaintiff sues for breach of warranty in a contract for the purchase of two steam boilers from the defendant. The contract sued upon is embodied in the following correspondence:

"The International Pavement Co.,
Office 71 Broadway, Room 100.
New York, August 26, 1881.

" *Messrs. Smith, Beggs & Ranken, St. Louis,—*

Dear Sirs: Our Mr. Hungerford reports to me that, in reply to his letter of inquiry respecting engine and boilers, that you have such, but are second-hand. How long have such been in use? Are they approximately as good as new? What is your price, f. o. b. for New Orleans? What is the weight? Can you give us rates

of freight to New Orleans? How soon could you ship? An early reply would oblige

Yours truly,

J. P. Robinson."

"Smith, Beggs & Ranken Machine Co., }
Manufacturers of }
Engines, Elevators and General Machinery. }

St. Louis, Mo., August 31, 1881.

"*J. P. Robinson, Pres. International Pavement Co., No. 71, Broadway, New York,*—

Dear Sir: Yours of the 26th inst., to hand, and in reply will state that the 16x30 was running a six-run flour mill, and we replaced it with one of our large engines, and took it in part pay. It was a slide valve engine, and we intend to take off these valves and put on our piston valves, and will put in first-class order, and will guarantee it to work well or no pay. The boilers we will test to 200 lbs., hydrostatic pressure, to 200 pounds to the square inch, and furnish you the tester's certificate before shipment. The breechen, smoke stack, fire front and all the boiler castings, the boiler feeder, steam and supply pipes, 16 exhaust and 35 suction pipes, mud check and safety valves, and glass water and steam gage, will be new and all complete and warranted, and delivered to steamboat here for $2750 (twenty-seven hundred and fifty dollars); weight 34,500 pounds.

Yours truly,

Smith, Beggs & Ranken Machine Co.

Johnston Beggs, Pres."

"New York, September 13, 1881.

*Messrs. Smith, Beggs & Ranken, St. Louis,*—

Gentlemen: Your favor of 31st inst., came to hand during my absence from the city. I should think your proposition a fair one, and upon the hypothesis that the previous use of same has not injured them, or that you, as stated in yours, will put them in first-class condition, ready for use, I accept the proposition. You will at once proceed in the completion of the same, and I will at a later date advise you as to the time for shipment to

comport with the shipment from here of other parts of
our machinery to New Orleans. Probably I shall send
from here our machinist to New Orleans, *via* St. Louis,
for consultation with you.

J. P. ROBINSON, President."

"NEW YORK, September 13, 1881.

"*Smith, Beggs & Ranken, St. Louis,*—

"We will take the engine and boilers as proposed by
letter of to-day.

J. P. ROBINSON, President."

"SMITH, BEGGS & RANKEN MACHINE Co., ⎫
Manf'rs of Engines, Elevators, and Gen'l Mach'ry., ⎬
Office and Warerooms, Nos. 800 and 802 N. Main St. ⎭

ST. LOUIS, September 17, 1881.

"*J. P. Robinson, Esq., Pres. International Pavement
Company,*

71 Broadway, New York City,—

"DEAR SIR:—Your telegram and letter of the 13th to
hand, and we are now at work overhauling the engine
and putting on our piston valves, which will make it
work as well, if not better, than it ever did. A great deal
of the machinery will be new, and we will have to pay
out the cash for it. And, as we have been putting in
new machinery and adding on additional buildings to
our foundry, we respectfully ask you to send us say
($1,500) fifteen hundred dollars, on account.

Hoping this will not incommoday [sic?] you, and that
you will appreciate our condition, we remain yours
truly,

SMITH, BEGGS & RANKEN MACHINE Co.,
JOHNSTON BEGGS, Pres."

It appears from the testimony that the plaintiff pur-
chased the boilers and engine for the use of the New
Orleans Paving and Draining Company. They were
landed at New Orleans on November 26th, 1881, and work
was at once commenced in putting them up for service.
The New Orleans Company, however, objected that the
boilers were unsafe and worthless, and notified the
plaintiff that it would not accept them. The testimony
tended further to show that a hammer test was applied,

which proved the boilers to be so worn and weak that they
would not have withstood a pressure of 60 pounds to
the square inch. The defendant's testimony tended to
show that, before the shipment, the boilers were tested
by a competent person; that they stood the test at a
hydrostatic pressure of 200 pounds to the square inch,
and that the tester's certificate to that effect was mailed
by the defendant to the plaintiff, at the time of the ship-
ment. The court instructed the jury as follows:

"The court instructs the jury that the burthen is upon
plaintiff of proving that there was a breach of warranty
on the part of defendant, and unless you believe from
the evidence that the boilers when shipped did not and
would not stand a hydrostatic pressure of 200 pounds to
the square inch, and that defendants did not furnish
plaintiffs with the tester's certificate, then plaintiff can
not recover in this action, and they should find for
defendant."

"The court instructs that, under the terms of the
contract between the plaintiffs and defendants, sued on
in this case, the defendants agreed to sell and ship to
plaintiffs two second-hand boilers, which defendant was
to test or have tested by 200 pounds hydrostatic pressure
to the square inch, and furnish to plaintiffs the tester's
certificate, and if they believe from all the evidence before
them, that the boilers shipped to plaintiffs did at the
time and place of delivery, which was aboard a vessel at
St. Louis, stand a test of 200 pounds to the square inch,
and that a certificate was sent to plaintiff by defendant,
signed by the party testing them, then plaintiffs can
not recover in this action, and they should find for
defendant."

The plaintiff urges supposed grounds of recovery
which these instructions ignore. It is contended that by
the terms of the contract the defendant was bound to
apply itself the hydrostatic test to the boilers, and that
in having this done by a person not in any way con-
nected with the corporation, the defendant failed of due
performance. We do not so read the contract. The

words are: "The boilers we will test to 200 lbs., hydrostatic pressure, to 200 pounds to the square inch, and furnish you the tester's certificate before shipment." The clause touching "the tester's certificate" must be taken as explanatory of what precedes. It shows that the tester was to be a natural person, and not the corporation making the contract. It implies, moreover, that he was to be a disinterested person. For, the certificate of the contracting party would certainly be of no more persuasive force, and no more available for any purpose than the contract itself. There is nothing in the point. No serious attempt was made to impeach the skill or competency of the person who applied the test.

. It is further contended that the contract implied a warranty that the boilers were reasonably fit for use in the purposes for which they were purchased; and that the plaintiff was entitled to recover, if the articles proved to be wholly unfit for those purposes. This brings up the question, to what extent an express warranty as to one particular, will exclude any claim of an implied warranty as to others. The general rule denies an implied warranty, as to any matter or particular which may be brought within the purview or intendment of the special warranty. But there may be an implied warranty so wholly independent of anything contemplated in the express warranty, as to stand by virtue of its own distinctive force. Thus A sells to B, who has no opportunity for inspection, a bin of "No. 2 white mixed corn," warranted to contain one thousand bushels. Here there is an express warranty as to the particular of quantity. There is also an implied warranty that the article contained in the bin is of the particular description mentioned, and not a different kind of corn.— *Whittaker* v. *McCormick*, 6 Mo. App. 114. But there is no sort of dependent connection between these two particulars, and it cannot be supposed that the express will exclude the implied warranty. Each stands as a separate and independent undertaking to be sustained or

enforced, or otherwise, upon its own merits. But no such separate undertakings are concerned in the question here before us. The matter of implied warranty which the plaintiff assumes is itself an integral element of the express warranty, into which it is merged, and by which its effect is circumscribed. The plaintiff's complaint is that the boilers were not strong enough—or sufficiently capable of sustaining pressure—for the purposes to which they were to be applied. It was to this specific quality of strength that the express warranty was directed, and in which the extent of the defendant's liability was limited by the words used. The boilers were to be tested to a hydrostatic pressure of 200 pounds to the square inch, and the tester's certificate thereof was to be furnished. Beyond this there was no warranty, implied or otherwise, having reference to the strength of the boilers. And no defect in any other particular is complained of, as constituting a breach of the defendant's warranty. It thus appears that the court submitted to the jury the only proper issue in this connection. The witnesses for the defendant testified that it complied literally with the terms of its warranty. These proofs were met by the plaintiff, with evidence that, after the boilers had arrived at New Orleans, a light blow with a light hammer was sufficient to knock a hole in one of them, where the iron was not more than one sixty-fourth of an inch in thickness. The jury weighed this conflicting testimony, and found the facts for the defendant. We have no authority to review their verdict. It may be said that as to other parts of the machinery furnished, the defendant's warranty was more comprehensive than as to the boilers. But, touching those other parts, there is no complaint of any breach.

The court struck out, on motion, several parts of the plaintiff's petition. The parts so stricken out were either allegations predicating a liability, founded upon theories which we have here shown to be unsound, or were mere statements of evidential facts. There was no error

in eliminating them from the record. The learned judge of the trial court seems to have adopted, from the first, a comprehensive and correct view of the whole case, and all his rulings were in conformity therewith. The judgment is affirmed. All the judges concur.