## MARTIN et al. v. AUTO FINANCE CO.
### No. 1917.

Court of Civil Appeals of Texas. Beaumont.
Feb. 19, 1930.
Rehearing Denied March 5, 1930.

Howth, Adams & Hart, of Beaumont, for appellants.

Smith, Crawford & Combs, of Beaumont, for appellee.

O'QUINN, J.

Appellee, the Auto Finance Company, a corporation, sued appellants, E. V. Martin and T. Q. Martin, composing the partnership firm of Martin Bros., to recover on seven certain notes, each for the sum of $500, with interest and attorneys fees, and to foreclose a chattel mortgage on certain building machinery given to secure the payment of said notes. Appellants, defendants, by their first amended original answer, pleaded general demurrer, general denial and a total failure ·of consideration, and certain other defenses not necessary to mention. At the trial, defendants, appellants, filed their trial amendment in which they expressly eliminated all of their defenses pleaded in their first amended original answer, except the general demurrer, general denial, and repleaded their defense of total failure of consideration for the notes in controversy.

The cause was tried to a jury but at the conclusion of the evidence the court instructed the jury to return a verdict for plaintiff, the appellee. The jury accordingly returned a verdict for the plaintiff, upon which judgment was entered for $3,500, together with interest thereon at the rate of 8 per cent. per annum from April 26, 1929, and the sum of $525 as attorneys fees (in accordance with the provisions of the notes), same to bear interest from the date of the judgment at the rate of 6 per cent. per annum, and foreclosing the chattel mortgage lien ·on the property mentioned in the petition and set forth in the ·mortgage. Motion for a new trial was overruled and the cause is before us for review on appeal.

Appellants' first four propositions relate to the ·court's instructing a verdict in favor of

appellee in the face of their defense of total failure of consideration, and insist that such action of the court was reversible error. This contention is based upon the assertion in appellants' pleading that appellee 'sold to appellants the property in question, upon which the mortgage was given to secure the payment of the notes sued on, same having been given for the purchase price of said property, and that said property (four Fordson tractors and four Iron Mules) were not suited for the purposes for which they were bought, would not do the work for which they were purchased and, therefore, the consideration for the notes had totally failed, and the court erred in not submitting the question to the jury. This contention cannot be sustained. There is no evidence showing a sale of the property by appellee to appellants. We do not deem it necessary or helpful to quote or discuss the testimony. The evidence given by all parties to the controversy, and those in any way connected with the transaction resulting in the execution of the notes sued on is clear and consistent, showing, without dispute, that appellee did not sell the property to appellants but, to the contrary, that appellee's only connection with the transaction was to cash the notes in question. That being the undisputed fact, the action of the court in directing the verdict was proper.

The fifth, sixth, seventh, eighth, and ninth propositions, in effect, assert that where a dealer, without special warranty, sells machinery, he impliedly warrants the machinery to be suitable for the purpose for which it was manufactured or bought, and, that the machinery involved being worthless for the purpose for which it was sold to appellants, the court should have submitted to the jury their defense or failure of consideration which they plead, and which issue the evidence raised.

■■ What we have said above, that there is no evidence to show that appellee sold the property to appellants, but, to the contrary, that all of the evidence showed without dispute that appellee did not sell said property to appellants, and that appellee's connection with the matter was simply their having bought the notes sued upon, disposes of these assignments. Not having sold the property to appellants, they did not stand in the attitude of warrantor to appellants of the fitness of the machinery for the purpose for which it was bought. There is nothing to show that appellee ever, in any manner, assumed such attitude. Moreover, appellants' contention as to the failure of the consideration (the notes sued on) given for the purchase of the property, cannot be sustained for the reason that appellants plead that the consideration had totally failed, which is not supported by the proof. The evidence is undisputed that the property (the four Fordson tractors and four Iron Mules) did have considerable value as workable machines and it cannot be contend-

ed that they did not have some value, at least as junk. This being true, and the defense pleaded being a total failure of consideration—that the property was wholly worthless, the evidence did not support the plea, and there was no error in the court's directing the verdict. Powell Co. v. Sturgeon (Tex. Civ. App.) 299 S. W. 274; Advance-Rumely Thresher Co. v. Higgins (Tex. Civ. App.) 279 S. W. 531; City of Cleburne v. Gutta Percha & Rubber Mfg. Co. (Tex. Civ. App.) 127 S. W. 1072.

What we have said renders appellants' other propositions immaterial, and they are all overruled. The judgment should be affirmed, and it is so ordered.

Affirmed.

### On Motion for Rehearing.

Appellants have filed herein a motion for rehearing in which they urge all of their ground presented on original hearing. We shall notice specifically but two of the assignments here presented.

■ Appellants' ninth and twelfth assignments in the motion for rehearing assert that the court erred in holding that there was no evidence in the record showing a sale of the property involved herein by appellee to appellants, and insist that there was ample evidence to raise said issue. As supporting this contention, appellants quote the following from the testimony of E. V. Martin, one of the defendants. "The Auto Finance Company sold us this machinery." This is all the testimony advanced in this motion, but appellants say there is other evidence to the same effect. It is true that on direct examination Martin did say: "The Auto Finance Company sold me this machinery." But on cross-examination his testimony clearly shows the machinery was not sold to appellants by appellee. Among other things, he testified: "I rang Mr. Hankamer up and told him we needed some steel mules equipment. Mr. Hankamer is connected with the Sour Lake Motor Company in Sour Lake, Texas, also. He and Mr. Hodgson and his brother, Mr. P. C. (Hankamer) came over to see me with respect to the sale. He told me Mr. Hodgson was Secretary-Treasurer of a finance concern, and it would be necessary to fix the papers so that Mr. Hodgson's concern would handle it, in order to put the deal through. He told me in connection with it he could sell the equipment. He said 'We will sell you the equipment that way,' would have to make the paper so the finance company could handle it. That is the way we agreed on it, and that is the way it was done. Mr. Hankamer delivered this stuff to me shown by the invoice, that is Mr. E. L. Hankamer."

He further testified: "I will tell you how it was. Mr. Hodgson owns part of the Sour Lake Motor Company. He and Mr. Hankamer

'sold the stuff to me. It was agreed that we would fix the paper in a manner satisfactory to Mr. Hodgson's finance company and that in that way the deal would be handled only by them. What they wanted to do was to sell me the stuff so that they could make the notes direct to Auto Finance Company. That is all. He told me he would have to make these notes so the Auto Finance Company would handle them. That is not correct that way, no, sir, not that way, no, sir. He did not tell me he would fix these notes so that the Auto Finance Company would handle them. He said, 'We will have to sell this equipment so we can make the notes out to the finance company.' Mr. Hodgson said that. Mr. Hankamer was there also. I say the deal was made between myself and these three fellows. Mr. Hankamer told me these notes would have to be fixed so that Mr. Hodgson's company would handle them, and he couldn't handle the deal otherwise, and said, 'We will sell you the equipment so you can make the notes direct to the finance company, and whatever notes satisfy the finance company he, Mr. Hankamer, was willing to make the deal on.'"

He further testified: "I can't recall any previous dealings I had with the Auto Finance Company. They probably handled some equipment for us. I have not had any prior dealings with the Auto Finance Company prior to this transaction, none that I recall. It is possible the Auto Finance Company has financed a prior deal for me. We have bought trucks and equipment all over Texas, and it is possible they have. I can't say offhand whether they have or not. It is true that I talked with a representative of the Bull Supply Company or Bull Motor Company about buying this machinery. I talked to several people about this equipment. The Auto Finance Company did not give me a bill of sale to this property that I know of * * * this invoice was sent to us by mail. Auto Finance Company's name does not appear on that. I don't know as that strikes me as anything peculiar, Mr. E. L. Hankamer being a party to the deal. It has merely got his name on it is all, on the invoice. I paid a down payment on this. I gave that to Mr. E. L. Hankamer."

He further testified: "I sent this $400 deposit check to Mr. Hankamer at Sour Lake. The first deposit check made on this purchase, I made that to Mr. Hankamer. From then on out my purchase was with Mr. Hankamer."

He further testified: "I know one Carl Graham. He represents Bull Equipment Company as salesman. They are agents for these steel mules and equipment of that sort, I think. It is a fact, because before this purchase was made, Mr. Carl Graham took up with me the question of this equipment, this stuff they handled, these iron mules and Fordson tractors, about two years ago I guess. Something like eight or ten days before this

trip of Mr. Hankamer, maybe not that long before the trip of Mr. Hankamer and Mr. Hodgson over to Vidor to see me, I had a conversation with Carl Graham about this. I had several conversations. He was trying to sell me this stuff. He told me it had to be bought through a Ford agency. He did not want me to take it to Gasow-Howard at Beaumont. I did not tell him I would rather have it through Sour Lake Motor Company. I told him I would buy it through Gasow-Howard. I told him I would, but I preferred to buy it through Sour Lake Motor Company after I talked to them. * * * After Mr. Carl Graham talked to me and I decided on this equipment, he did not call the Sour Lake Motor Company in my presence. I don't remember the day I called Mr. Hankamer at Sour Lake and talked to him about purchasing this equipment. I talked to Mr. E. L. Hankamer, but not from Mr. Bull's, from my office. I told him I had been talking to Mr. Carl Graham about this and wanted to handle it through Sour Lake Motor Company."

E. L. Hankamer testified: "I am E. L. Hankamer. I am connected with Sour Lake Motor Company. I have charge of sales. That is a partnership. I am one of the owning and managing partners of the Sour Lake Motor Company, Sour Lake, Texas. I know E. V. Martin. I had a transaction with him along in December of last year with respect to the sale of some steel mules and Fordson tractors. I had dealings with him prior to that time. A couple or three years ago I sold Mr. Martin some trucks and also a tractor. That was three or four years ago. The first of this deal of the sale of the four tractors and four steel mules that I knew about, Mr. Carl Graham, who is the C. W. Bull Equipment Company man, called me from Beaumont and told me he had seen Mr. Martin on this equipment, on these tractors. Mr. Graham called me about the equipment. Mr. Martin called me later in the day. He called and said he would like to buy—he had been sold on this equipment."

He further testified: "It was some thirty days before the deal. So Mr. Martin called in the afternoon to tell me he preferred to buy this equipment through Sour Lake Motor Company, that he had been shown the equipment by Mr. Graham, and that he was throughly sold on it, and that he preferred to buy through the Sour Lake Motor Company, and asked for an appointment the following Sunday at his home at Vidor, so we made the appointment at three o'clock, I believe it was, in the afternoon, so we went over there in the afternoon, went by Beaumont. Something was said at that time between Mr. Martin and me respecting the financing of the deal. He asked about financing it. He wanted to buy this equipment, to pay, I believe it was, $1000. He suggested he could pay them. We told him we wasn't in position to handle

a deal of that kind with such a small payment, but that is when he asked for an appointment then on the following Sunday; and I told him I would get in touch with Mr. Hodgson, who handled our paper, and we would see if we could arrange to finance it. Then Sunday afternoon we met Mr. Martin at his home in Vidor at three o'clock, and Mr. Hodgson was with us. So after going into the details, we decided that—Mr. Hodgson did, that they would handle it on a 25% down basis, that is, they would cash the notes for us on that basis, which was below their schedule. So the equipment figured, if I remember correctly, $6000, and that he would pay us $1500 down and make nine $500 notes. So we closed the deal on that day at his home. He asked what deposit we required. So we suggested to him to pay $100 per unit as a deposit, so he says 'Well, I will mail you a check in the morning for $400, to Sour Lake Motor Company, and the following Tuesday I received his check and placed his order. This check was made to Sour Lake Motor Company, deposit on these four units. The deal, everything was arranged on this basis, $1500 down and nine $500 notes, I got the notes signed. I took the notes and mortgage to Mr. Martin's office. He signed there before Mr. Hughes, I believe his name is. I took the notes to Auto Finance Company and they cashed them. Mr. Hodgson represented the Auto Finance Company. I turned the notes over to Mr. Hodgson and he cashed them. He gave me a check for them. Mr. Martin signed them. I am connected in no way whatever with Auto Finance Company. I do not own any stock in it at all. Mr. Hodgson is not connected with Sour Lake Motor Company. He owns no stock in it."

He further testified: "I do not say that E. L. Hankamer sold these iron mules and tractors to Martin Bros. I say C. C. Bull sold them. We handled them through Sour Lakes Motor Company. I delivered them. I guess you would call it Sour Lake Motor Company sold this equipment, this machinery to Martin Bros. We arranged to sell them through Sour Lake Motor Company. * * * I told Mr. Martin I knew nothing at all of the equipment. Bull had sold him on the equipment before I knew anything of the deal. I do not recall sending him to Bull. Bull sent him to us a number of times for adjustment. He would go to Bull and Bull would in turn call on us."

He further testified: "At the time we sold this equipment to Mr. Martin I did not make any warranty or representations at all with regard to the equipment. * * * C. W. Bull Equipment Company won't sell to the consumer direct, so Mr. Martin suggested to the C. W. Bull man he buy the equipment through Sour Lake Motor Company. In fact, the Bull man had him sold on the equipment before I knew anything about it. That is the way this particular equipment was sold. The C. W. Bull man sold it and Mr. Martin asked to buy it through Sour Lake Motor Company. It was sold through Sour Lake Motor Company and the Auto Finance Company financed it."

It clearly appears that neither Hodgson nor the Auto Finance Company were in any way connected with Hankamer's company—the Sour Lake Motor Company.

In the chattel mortgage executed by appellants, E. V. and T. Q. Martin, to secure the payment of the notes sued on, the receipt of the money ($4,500—the face value of the notes) by appellants from the appellee, Auto Finance Company, is acknowledged, and it is specially recited that "the money advanced to mortgagor and secured by the personal property herein described, has been used to pay the purchase price of the said personal property." This constitutes a written acknowledgment by appellants that appellee did not sell the property to appellants, but that appellee advanced the money (by cashing the notes) to appellants to buy and with which they did buy the said property.

We have quoted but a small portion of the testimony, but say that when the entire record is considered it appears, we think, without dispute, that appellee did not sell the machinery involved to appellants, but that appellee's connection with the matter was simply to cash the notes and thus aid in closing the transaction.

Appellants say that we erred in holding that, inasmuch as they had pleaded only a total failure of consideration, they could not avail themselves of proof of a partial failure of consideration.

We did not hold, and we do not believe that our opinion is subject to the construction that we held, that simply because the plea was of total failure of consideration, for that reason proof of partial failure of consideration could not be made as a defense to the cause of action asserted. If our opinion is subject to be so construed, then we hasten to say that such was not our intention, for such is not the law. It has been long settled in this state that under a plea of total failure of consideration, a partial failure of consideration might be shown. Mercer v. Hall, 2 Tex. 284; Brantley v. Thomas, 22 Tex. 271, 275, 73 Am. Dec. 264; Johnson v. Shrewsbury (Tex. Civ. App.) 297 S. W. 1094; see also authorities cited by us in original opinion on question of total failure of consideration. We held that the plea of total failure of consideration was not supported by the proof and, therefore, could not be sustained. It will be noted there was no proof of the extent, if any, of partial failure of consideration, and we were not passing upon that phase of the case. The plea was of total failure, and the contention throughout was that the consideration

had totally failed. But, as we said in our original opinion, we think the discussion of failure of consideration is beside the case for the reason that the record discloses unquestionably that appellee did not sell the machinery in question to appellants, and, therefore, appellee is not affected by the defense of failure of consideration pleaded.

The motion should be overruled, and it is so ordered.